1

2

3

4

5

6

7

8                          IN THE UNITED STATES DISTRICT COURT

9                          FOR THE EASTERN DISTRICT OF CALIFORNIA

10    ROGER GARCIA,

11              Plaintiff,                    No. 2:10-cv-02693 KJM KJN P

12        VS.

13    A. PALOMINO, et al.,

14              Defendants.                   FINDINGS AND RECOMMENDATIONS

15    _____/

16    I.  Introduction

17              Plaintiff is a state prisoner, incarcerated at Mule Creek State Prison, who proceeds

18    in forma pauperis and without counsel in this civil rights action filed pursuant to 42 U.S.C. §

19    1983.  This action proceeds on plaintiff's First Amended Complaint, wherein plaintiff claims that

20    defendants -- Registered Nurse A. Palomino, Physician's Assistant O. Akintola, and orthopedic

21    physician and surgeon Dr. Lovett -- were deliberately indifferent to plaintiff's serious medical

22    needs, in violation of plaintiff's Eighth Amendment rights.  Pending is defendant's motion for

23    summary judgment.  (ECF No. 28.)

24              Defendants timely informed plaintiff of the requirements for opposing a motion

25    for summary judgment, pursuant to Woods v. Carey, 684 F.3d 934 (9th Cir. 2012), and Rand v.

26    Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc).  (ECF No. 29.)  Plaintiff filed an

                                              1

opposition (ECF No. 30), and defendants filed a bifurcated reply (ECF Nos. 33-4).  For the reasons that follow, the court recommends that defendants' motion for summary judgment be granted.

II.  Background

This action proceeds on plaintiff's verified First Amended Complaint ("FAC"), filed February 22, 2011.  (ECF No. 11.)  Defendants' motion to dismiss was denied in its entirety by order filed March 21, 2012 (ECF No. 23), which adopted the undersigned's findings and recommendations filed January 18, 2012 (ECF No. 22).  Discovery closed on July 20, 2012. (ECF No. 25.)

Defendants move for summary judgment on the ground that they are entitled to judgment as a matter of law or, alternatively, that they are entitled to qualified immunity.

III.  Legal Standards

A.  Summary Judgment

Summary judgment is appropriate when it is demonstrated that the standard set forth in Federal Rule of Civil procedure 56 is met.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P. 56(c).)  "Where the nonmoving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case."  Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 Advisory

Committee Notes to 2010 Amendments (recognizing that "a party who does not have the trial

burden of production may rely on a showing that a party who does have the trial burden cannot

produce admissible evidence to carry its burden as to the fact").  Indeed, summary judgment

should be entered, after adequate time for discovery and upon motion, against a party who fails to

make a showing sufficient to establish the existence of an element essential to that party's case,

and on which that party will bear the burden of proof at trial.  Celotex Corp., 477 U.S. at 322.

"[A] complete failure of proof concerning an essential element of the nonmoving party's case

necessarily renders all other facts immaterial."  Id. at 323.

Consequently, if the moving party meets its initial responsibility, the burden then

shifts to the opposing party to establish that a genuine issue as to any material fact actually exists.

See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting

to establish the existence of such a factual dispute, the opposing party may not rely upon the

allegations or denials of its pleadings, but is required to tender evidence of specific facts in the

form of affidavits, and/or admissible discovery material in support of its contention that such a

dispute exists.  See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party

must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433,

1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party

need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary

judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

3

1   genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

2   committee's note on 1963 amendments).

3            In resolving a summary judgment motion, the court examines the pleadings,

4   depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

5   any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson,

6   477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the

7   court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587.

8   Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

9   produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen

10  Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

11  1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

12  show that there is some metaphysical doubt as to the material facts. . . . Where the record taken

13  as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

14  'genuine issue for trial.'" Matsushita, 475 U.S. at 586 (citation omitted).

15           B. Deliberate Indifference to Serious Medical Needs

16           To prevail on a claim for deliberate indifference to serious medical needs, in

17  violation of the Eighth Amendment's proscription against cruel or unusual punishment, a

18  plaintiff must demonstrate that a prison official "kn[ew] of and disregard[ed] an excessive risk to

19  inmate health or safety; the official must both be aware of the facts from which the inference

20  could be drawn that a substantial risk of serious harm exists, and he must also draw the

21  inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994). Mere negligence is insufficient for

22  Eighth Amendment liability. Frost v. Agnos, 152 F.3d 1124, 1128 (9th Cir. 1998).

23           "In the Ninth Circuit, the test for deliberate indifference consists of two parts.

24  First, the plaintiff must show a serious medical need by demonstrating that failure to treat a

25  prisoner's condition could result in further significant injury or the unnecessary and wanton

26  infliction of pain. Second, the plaintiff must show the defendant's response to the need was

1   deliberately indifferent.  This second prong . . . is satisfied by showing (a) a purposeful act or

2   failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the

3   indifference." Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal citations, punctuation

4   and quotation marks omitted).  A mere difference of opinion between a prisoner and prison

5   medical staff as to appropriate medical care does not give rise to a Section 1983 claim.  Franklin

6   v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).

7           Whether a defendant had requisite knowledge of a substantial risk of harm is a

8   question of fact.  "[A] factfinder may conclude that a prison official knew of a substantial risk

9   from the very fact that the risk was obvious.  The inference of knowledge from an obvious risk

10  has been described by the Supreme Court as a rebuttable presumption, and thus prison officials

11  bear the burden of proving ignorance of an obvious risk. . . . [D]efendants cannot escape liability

12  by virtue of their having turned a blind eye to facts or inferences strongly suspected to be true . . .

13  ." Coleman v. Wilson, 912 F. Supp. 1282, 1316 (E.D. Cal. 1995), citing Farmer, 511 U.S. at

14  842-43 (internal quotation marks omitted).

15          When the risk is not obvious, the requisite knowledge may still be inferred by

16  evidence showing that the defendant refused to verify underlying facts or declined to confirm

17  inferences that he strongly suspected to be true.  Farmer, 511 U.S. at 842.  On the other hand,

18  prisons officials may avoid liability by demonstrating "that they did not know of the underlying

19  facts indicating a sufficiently substantial danger and that they were therefore unaware of a

20  danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to

21  which the facts gave rise was insubstantial or nonexistent." Id. at 844.  Thus, liability may be

22  avoided by presenting evidence that the defendant lacked knowledge of the risk and/or that his

23  response was reasonable in light of all the circumstances. Id. at 844-45; see also Wilson v.

24  Seiter, 501 U.S. 294, 298 (1991); Thomas v. Ponder, 611 F.3d 1144, 1150-51 (9th Cir. 2010).

25  ////

26  ////

5

IV. <u>Undisputed and Disputed Facts</u>

The following facts are undisputed by the parties or, following the court's review of the record, have been deemed undisputed for purposes of the pending motion. Certain disputed facts are also noted.

1. At all relevant times, plaintiff was incarcerated at Mule Creek State Prison ("MCSP"), in the custody of the California Department of Corrections and Rehabilitation ("CDCR").

2. At all relevant times, defendant A. Palomino was employed by CDCR as a Registered Nurse ("RN") at MCSP. Palomino became a certified Licensed Vocational Nurse in 1992, and a RN in 2002.

3. At all relevant times, defendant O. Akintola was a Physician's Assistant ("PA") licensed in the state of California and employed by CDCR. Akintola completed the PA program at the University of California, Davis, School of Medicine, in 2001, and is board certified; he has been employed with the CDCR for seven years and assigned to MCSP since 2005.

4. At all relevant times, defendant Dr. Lovett served, on a contract basis, as an orthopedic physician and surgeon at MCSP. Dr. Lovett has held this position commencing August 17, 2007, to the present. Dr. Lovett earned his medical degree in 1980 at the University of Arizona College of Medicine, and has been licensed to practice medicine continuously from 1981 to the present. Since 1987, Dr. Lovett has been an orthopedic specialist certified by the American Board of Orthopedic Surgeons.

5. On September 2, 2007, plaintiff injured his finger -- the fourth digit of his right hand -- while playing basketball. Plaintiff testified that he immediately experienced "extreme pain," and knew from prior experience with other injuries, that he had broken a bone. (Pltf. Depo. at 15-6.) However, at the time of the injury, plaintiff experienced no swelling, bleeding or protruding bones. (<u>Id.</u> at 16.)

1      6.  The parties dispute whether plaintiff had contact with defendant Palomino on

2   September 2, 2007.

3          a.  Plaintiff avers that he went to the MCSP A-Yard Clinic and "showed

4   A. Palomino R.N. his broken finger;" that he told Palomino he had just broken his finger playing

5   basketball; that Palomino told plaintiff to put in a sick call slip; that plaintiff "replied that my

6   broken finger was a medical emergency . . . and told her I was in too much pain to wait two days

7   to get medical care" (the following day was Labor Day); and that Palomino responded, "I'm

8   ordering you to leave now," and motioned for the clinic security guard.  (Pltf. Decl. at ¶ 3.)

9          b.  Defendant Palomino avers that "I have no recollection of seeing inmate

10   Garcia at the A-Yard medical clinic on September 2, 2007.  On that date, I worked in the back of

11   the medical clinic and only saw inmates with appointments.  I would not have seen inmates who

12   walked in for medical emergencies.  As such, I did not see Garcia, nor did I deny Garcia medical

13   treatment for his finger on September 2, 2007."  (Palomino Decl. at ¶ 3.)

14      7.  Plaintiff completed a Health Care Services Request Form, which he signed and

15   dated September 4, 2007, and described the reason for the request as follows:  "I have what

16   appears to be a broken finger that happened on 9-2-07, and I need to be seen it's an emergency.

17   Thank you."  (ECF No. 28-2 at 43 (Dfts. Exh. E).)  Plaintiff avers that he submitted this request

18   to the A-Yard Clinic on September 4, 2007.

19      8.  The parties dispute whether plaintiff had contact with defendant Palomino on

20   September 4, 2007.

21          a.  Plaintiff avers that, on this date, when he returned to the A-Yard Clinic

22   with his request for medical services, he tried to give his request to Palomino, and again showed

23   her his broken finger, stating that he was in "very bad pain," and "asked her to treat my finger,

24   contact a doctor to treat it, x-ray, and please give me something for the pain."  (Pltf. Decl. at ¶ 5.)

25   Plaintiff states that Palomino stood at the clinic door and replied, "Put your medical request into

26   the box outside the clinic, leave and it will be read tomorrow."  (Id.)

7

1    b.  Defendant Palomino makes no averments regarding September 4, 2007.

2    9.  The parties dispute the nature of their interactions on September 5, 2007.

3    a.  Plaintiff avers as follows: "On September 5, 2007, I returned to the A-

4    Yard Clinic.  I hoped that Nurse Palomino would not be there so I could see some other nurse so

5    I could get treatment.  To my dismay, Nurse Palomino was there.  Again, she stopped me at the

6    door.  I asked her with tears in my eyes to please do something for my broken finger.  I told her it

7    hurt constantly.  Nurse Palomino summoned the guard assigned to the clinic and asked him to

8    escort me away from the clinic.  I told her I would leave on my own and left.  I returned to my

9    cell and lay down, racked with pain." (Pltf. Decl. at ¶ 6.)  "On the evening of September 5th, I

10   received a ducat to report to the A-Yard Clinic nurse's line on September 6, 2007."  (Id. at ¶ 7.)

11   b.  Defendant Palomino avers as follows: "The first date that I recall

12   seeing inmate Garcia regarding his finger was on September 5, 2007.  As the triage nurse on that

13   day, I responded to inmate Garcia's Health Care Services Request [Form 7362].  Inmate Garcia

14   informed me that he was playing basketball on September 2, 2007, and hurt his finger.  I did not

15   observe any bleeding, protruding bones, or significant swelling.  Therefore, I did not believe that

16   Garcia had a medical emergency, and I scheduled Garcia for an appointment for the next morning

17   based on CDCR protocol." (Palomino Decl. at ¶ 4.)

18   10.   The parties agree that defendant Palomino, acting as the triage nurse,

19   examined plaintiff's finger on September 6, 2007, pursuant to the ducat that plaintiff had

20   received the night before.  The parties dispute their interaction pursuant to this September 6,

21   2007 appointment.

22   a.  Plaintiff avers that, on this date, Palomino failed to respond to his

23   injury on an emergency basis.  As alleged in the FAC, after Palomino interviewed plaintiff and

24   examined his finger, she telephoned Dr. Hashimoto, who ordered an x-ray.  When plaintiff asked

25   when the x-ray would be scheduled, Palomino reportedly responded, "When they get around to

26   it." (FAC at 4.)  The pertinent request for services was designated a "routine" request." (Dfts.

8

Exh. E.)  Plaintiff further alleges,  "I told her I need x-rays now because any further wait would result in my finger healing wrong, a permanent disformity (sic).  Palomino responded by ordering me to leave the clinic."  (Id.; see also Pltf. Decl. at ¶ 6.)

        b.  Defendant Palomino avers in pertinent part:  "On September 6, 2007, I saw inmate Garcia around 10:20 a.m.  I took inmate Garcia's vital signs and examined the fourth digit of the right hand, which inmate Garcia stated he injured.  There was moderate swelling, but the alignment of the finger was good.  I notified the physician on duty, Dr. Hashimoto, about inmate Garcia's complaints at 10:25 a.m.  Dr. Hashimoto ordered x-rays for inmate Garcia on that day, and prescribed 600 mg of Motrin (ibuprofen) to be taken for two weeks, as needed for pain relief. A true and correct copy of my progress note is attached to the Appendix as Exhibit E."  [ECF No. 28-2 at 43-5].  (Palomino Decl. at ¶ 5.)  Palomino further avers that, "As a Registered Nurse, I am responsible for referring inmates to a physician if further examination and/or treatment is medically indicated.  I have no authority to order x-rays without the permission of a physician. Moreover, I have no control over when x-rays are scheduled."  (Id. at ¶ 6.)

        11.  On September 11, 2007, x-rays were taken of plaintiff's finger.  The results were reviewed by Dr. Galloway who, on the same day, made an "urgent" referral of plaintiff to orthopedic surgeon Dr. Lovett.  (ECF No. 30 at 26 (Pltf. Exh. 3).)  Dr. Galloway's treatment notes included the following:  "(1 ) bulbous proximal interphalangeal joint in the third finger; (2) dorsal displacement in the fourth finger; and (3) hyperextended proximal interphalangeal joint in the fifth finger."  (Defendants' Separate Statement of Undisputed Facts ("SSUF") (ECF No. 28-1, ¶ 9), reflecting Dr. Lovett's construction of Dr. Galloway's treatment notes (ECF No. 28-2 at 47 (Dfts. Exh. F); and id. at 36 (Dfts. Exh. D).)  Dr. Galloway's notes also indicate, "This occurred 9 days ago!"  (Id., Exh. F (original emphasis).)  However, Dr. Galloway also noted that plaintiff had "variously splinted (buddy & popsicle) [his injured finger] and continued to play basketball.  Pain is modest."  (Id.)

1    12.  On September 13, 2007, Dr. Lovett examined plaintiff's finger and scheduled

2    him for surgery.

3    13.  On September 17, 2007, Dr. Lovett performed the following surgery on

4    plaintiff's broken finger -- an "[o]pen reduction and internal fixation with volar place

5    reconstructions and right ring dorsal dislocation (sic)."  (Lovett Decl. at ¶¶ 4, 5; Dfts. Exh. D, G.)

6    Dr. Lovett stated that "[t]here were no complications, and Garcia tolerated the procedure well."

7    (Lovett Decl. ¶ 5.)  Later that day, plaintiff was discharged back to MCSP, with orders for him to

8    take Ibuprofen, Acetaminophen, and Vicodin for pain.

9    14.  On September 27, 2007, Dr. Lovett conducted a follow-up examination of

10   plaintiff's finger, which appeared normal.  Dr. Lovett scheduled plaintiff for suture removal and

11   a follow-up examination, and instructed plaintiff to keep his bandages dry and clean.

12   15.  From September 24, 2007, to September 30, 2007, plaintiff was seen

13   regularly by MCSP medical staff for changes of his surgical dressing.  These records provide the

14   following:

15   a.  September 24, 2007, progress note for dressing change indicates no

16   wound drainage, "pin intact and well placed."  (ECF No. 28-2 at 56 (Dfts. Exh. J).)

17   b.  September 25, 2007, entry without notes.  (Id.)

18   c.  September 30, 2007, progress note for dressing change, indicating "[n]o

19   drainage present.  Pin intact.  Inmate denies pain or discomfort.  Inmate counseled to report every

20   day for dressing change."  (Id.)

21   16.  The parties dispute the details of plaintiff's appointment with Dr. Akintola on

22   October 1, 2007.

23   a.  Plaintiff alleges that "[o]n October 1, 2007, I was seen by Dr. (sic)

24   Akintola.  A foul odor emanated from my finger as puss oozed from it.  Dr. Akintola wrote a

25   complete page of progress notes, all of it illegible."  (Pltf. Decl. at ¶ 15.)

26   b.  PA Akintola states that, "On October 1, 2007, I saw inmate Garcia at

10

for (sic) a follow-up after his surgery, which had occurred on September 17, 2007.  I examined inmate Garcia's finger and changed the dressing.  I did not notice any abnormalities from the surgery.  I also noted that Garcia's sutures would be removed on Tuesday, October 4, 2008."  (Akintola Decl. at ¶ 4.)

   c.  The October 1, 2007, progress notes indicate a surgical dressing change without complications.  (ECF No. 28-2 at 56 (Dfts. Exh. J); id. at 58 (Dfts. Exh. K); ECF No. 30 at 30 (Pltf. Exh. 6).)

   17.  The parties dispute the condition of plaintiff's surgical site on October 3, and October 4, 2007:

   a.  Plaintiff alleges that "[m]y finger was hurting very badly.  On October 3, 2007, the nurse who changed the dressing wrote in my MCSP medical chart, 'CDC 7230,' 'foul odor or drainage noted."  (Pltf. Decl. at ¶ 16.)

   b.  However, the October 4, 2007, progress notes indicate that plaintiff's sutures were removed by a licensed vocational nurse on that date, and that the "wound [was] c/d/i [clean, dry, intact], looks clean without elo [sic] infection."  (ECF No. 28-2 at 60 (Dfts. Exh. L).)

   18.  The parties dispute some of the details of plaintiff's medical care on October 11, 2007:

   a.  Plaintiff's treatment records indicate that plaintiff reported to the medical clinic on October 11, 2007, that his surgical dressing was saturated with blood, and that he complained of pain in his finger.  Plaintiff stated that he had slept on his hand.  The attending nurse indicated that the finger was "swollen, reddened & opened; draining wound with surgical pen (sic) inserted - difficulty with ROM [range of motion][ -- c/o [complains of] severe pain -- needs M.D. evaluation today, supposed to see Dr. Lovett (ortho) today . . . Dr. Lovett unable to see pt today . . ."  (ECF No. 30 at 33 (Pltf. Exh. 9); ECF No. 28-2 at 64-5 (Dfts. Exh. N).)

   b.  Plaintiff alleges only that "[o]n October 11, 2007, Dr. Akintola saw me again.  He informed me that he could not give an adequate diagnosis because my MCSP medical

1  chart was missing.  He prescribed antibiotics and motrin." (Pltf. Decl. at ¶ 17.)

2        c.  PA Akintola states that, on October 11, 2007, "[a]lthough inmate

3  Garcia's chart was not available, I was able to examine inmate Garcia's finger and prescribe

4  inmate Garcia antibiotics.  Based on my examination, it appeared that inmate Garcia had

5  developed a post-operative infection on his right fourth finger.  I prescribed 500 mg of

6  Ciprofloxacin to be taken twice a day for fourteen days.  Ciprofloxacin is used to treat or prevent

7  certain infections caused by bacteria, and is frequently used for skin and skin structure infections.

8  I also wrote a prescription for Ibuprofen, which was to be taken three times a day for thirty days,

9  for pain relief.  The prescription was approved by the supervising physician, Dr. Hashimoto."

10  (Akintola Decl. at ¶ 5.)

11        19.  From October 14 to 19, 2007, plaintiff had repeated dressing changes, with

12  the following notations:

13        a.  October 14, 2007, "yellow & brown drainage on old dsg.  Wound

14  cleansed with peroxide. . . ."  (ECF No. 28-2 at 62.)

15        b.  October 15, 2007, "wound healing well,  Swelling x 2 and reducing.

16  Pin intact.  Some scant drainage. . . ."  (Id.)

17        c.  October 19, 2007, "edema noted with small amount white discharge

18  from lower bottom finger.  Cleansed with S.S. until no signs of discharge & covered with

19  nonadhesive dry drsg.  Drsg intact upon departure." (Id.)

20        20.  On October 30, 2007, custody staff sent plaintiff to the medical clinic because

21  the surgical pin had come out.  Plaintiff's finger was examined by Dr. Hawkins, who noted that

22  the finger was swollen and lacked range of motion.  Dr. Hawkins scheduled an appointment with

23  Dr. Lovett.  (Dfts. Exh. R.)

24        21.  On November 8, 2007, Dr. Lovett examined plaintiff's finger, and dictated

25  the following report (Dfts. Exh. S):

26  ////

1
2
3
4
5

> Patient came here to follow up after a very difficult attempt at construction of a volar plate of the right ring finger PIP [proximal interphalangeal] joint.  He developed some infection mostly because a pin became loose; the patient actually removed it some time after his surgery.  He has diffuse cuneiform swelling, but I explained that this may take 6 months to a year to resolve and probably will require an arthrodesis of the PIP joint.  It is stable; however, he does note that he does have significant degenerative joint disease.  [¶]  Patient will be seen back in a couple of months.

6           As recounted in 2012, Dr. Lovett described the same examination as follows

7  (Lovett Decl. at ¶ 15):

8
9
10
11
12
13
14

> On November 8, 2007, I conducted a follow-up examination of inmate Garcia.  I noted that inmate Garcia had removed the pin from his finger himself and developed an infection.  Based on my professional experience, it was not likely that the pin had come out on its own, because the pin was properly placed and remained intact for weeks after the surgery.  During the examination, I noticed that inmate Garcia had swelling in his finger, and I explained to him that it may take 6 months to a year to resolve. Inmate Garcia also had significant degenerative joint disease, unrelated to his finger injury and surgery. Overall, inmate Garcia's finger was stable, and I scheduled a follow-up appointment for a few months later.

15           22.  On November 19, 2007, plaintiff was examined at the MCSP medical clinic.

16  The treatment notes indicate that a culture taken October 30, 2007, was positive for staph

17  aureras, and Septra had been prescribed.  Plaintiff stated that he had stopped taking the Septra

18  when the swelling in his finger subsided, then restarted the medication when his finger again

19  swelled, and ultimately finished the medication.  Plaintiff also stated that he had, on three

20  occasions, inserted a needle in his finger and squeezed out yellow pus.  On November 19, 2007,

21  the finger was swollen and hard with limited ROM, but not erythema.  Further x-rays were

22  ordered, and another antibiotic (Clindamycin) prescribed, based on the assessment that plaintiff

23  continued to have a staph infection;  plaintiff was instructed to refrain from puncturing his finger.

24  A notation was made to rule out osteomyelitis.  (ECF No. 28-2 at 77 (Dfts. Exh. T); ECF No. 30

25  at 35 (Pltf. Exh. 11).)

26  ////

23.  On November 21, 2007, plaintiff was examined by PA Todd, who lanced plaintiff's finger; Todd's records indicate that there was blood but no pus.  Plaintiff was instructed to continue taking the Clindamycin.  Also on November 21, 2007, Dr. Hashimoto shot Lidocaine into plaintiff's finger for pain relief.  (ECF No. 28-2 at 79 (Dfts. Exh. U); ECF No. 30 at 36 (Pltf. Exh. 12).)  As alleged in his complaint, plaintiff avers that, on November 21, 2007, his "pain was so intense that Dr. Hashimoto shot lidocaine into plaintiff's finger and lanced it because the pus was putting so much pressure on plaintiff's finger."  (FAC at ¶ 22.)

24.  X-rays taken on November 21, 2007, indicated the following, as reviewed by Dr. Pepper (Pltf. Exh. 14):

> AP, lateral, and oblique views are presented and reveal a postoperative appearance of the proximal interphalangeal joint of the right fourth digit.  There is a small residual metallic pin noted, possibly part of a screw or fixation device.  There is contiguous demineralization of the proximal interphalangeal joint.
>
> I see no new bone formation and the likelihood [of] osteomyelitis appears minimal, but cannot be excluded.  Some soft tissue swelling is seen at the proximal interphalangeal joint.
>
> Impression:
> 1.  Postoperative appearance of the proximal interphalangeal joint of the right fourth digit.
> 2.  Demineralization is seen in the contiguous margins of this joint, and although I do not favor osteomyelitis as an etiological basis I cannot excluded such a[n] entity.  Consideration for MRI of the hand is advised.  No other abnormalities seen.

25.  However, plaintiff states that, on November 26, 2007, when he was seen by orthopedic surgeon Dr. Tseng "for the post-surgery follow-up on my finger[,] Dr. Tseng told me that his evaluation was limited because no x-ray results were available to him."  (FAC at ¶ 23.)

26.  The parties dispute the condition of plaintiff's finger from November 22, 2007, to November 27, 2007, when plaintiff appeared at the clinic for dressing changes.  The progress notes indicate the following:

a.  November 22, 2007, "old drsg came off easily without foul order or discharge . . . wound draining bright red blood in small amount. . . ."  (ECF No. 28-2 at 82 (Dfts.

14

1  Exh. V.)

2            b.  November 23, 2007, "old bandage came off easily with dark dry blood .

3  . . no active bleeding or sign of infection. . . ." (Id.)

4            c.  November 24, 2007, "old drsg not present.  No foul odor or drainage

5  noted.  Wound appears to be healing nicely without redness or swelling. . . ." (Id.)

6            d.  November 25, 2007, "very well healing open wound appx 1 cm x 3 cm.

7  . . . Bleeds actively when dressing removed . . . ." (Id.)

8            e.  November 27, 2007,  "Inmate removed drsg in clinic & began

9  squeezing wound.  I asked him why he was doing that & he stated he was 'trying to clean it.'  I

10  instructed I/M to refrain from applying pressure to wound & that squeezing wound prohibits

11  healing and enhanced trauma.  No active bleeding from wound once I/M stopped squeezing it.

12  Fresh blood on old drsg from I/M self affliction. . . . no draining or foul odor.  Appears to be

13  closing . . . /M promised to leave drsg on & refrain from traumatizing wound." (Id. at 81.)

14            f.  November 28, 2007, "I/M  removed drsg & smelled hand.  Asked to

15  wash hand.  I stated I would clean wound with SS [saline solution] but I/M insisted on washing

16  hand with wound on it.  I/M noncompliant to counsel on waiting to remove drsg.  Wound still

17  open but appears to be healing nicely. . . ." (Id.)

18            g.  November 29, 2007, "no draining.  I/M stated he soaked hand when

19  washing . . . I encouraged I/M to comply with M.D. order to keep wound dry and clean.  I/M

20  stated, 'I understand.'. . . Wound shows no signs/symptoms of infection." (Id.)

21            27.  On December 20, 2007, Dr. Lovett conducted a follow-up examination of

22  plaintiff, and dictated the following report (Dfts. Exh. W):

23            Patient is seen here on follow up following a very complex
                reconstruction of an unstable right ring PIP dislocation.  His
24            operation was complicated, initially, by a pen (sic) track infection
                which has resolved and the patient is doing much better.  I expect
25            that he will continue to note improvement for six months to a year,
                as the swelling has nearly completely resolved and he obtains range
26            of motion.  I have given instructions and range of motion exercises.

1       I do not feel that he needs physical therapy and does not require
2       any further follow up.

3       As recounted in 2012, Dr. Lovett described the same examination as follows

4  (Lovett Decl. at ¶ 19):

5       On December 20, 2007, I conducted a follow-up examination of
        inmate Garcia.  Although inmate Garcia had an infection, it had
6       resolved and inmate Garcia was doing much better.  The swelling
        had mostly resolved, and I gave inmate Garcia a range of motion
7       exercises to do in his cell.  I did not feel that inmate Garcia needed
        formal physical therapy.

8

9       28.  On February 14, 2008, Dr. Lovett conducted another follow-up examination

10  of plaintiff, and dictated the following report (Dfts. Exh. X):

11       Patient is making definite progress.  There are no signs of
        infection.  He is out shooting hoops, is working on getting his
12       flexion down, but at this time I would expect that he will never
        regain full range of motion, although he is doing much better
13       through the MP joint.  [¶]  He will be seen back on a prn basis.  He
        has had multiple problems with all of his digits, especially even his
14       long finger on his right hand.

15       As recounted in 2012, Dr. Lovett described the same examination as follows

16  (Lovett Decl. at ¶ 20):

17       On February 14, 2008, I conducted a follow-up examination of
        inmate Garcia.  Inmate Garcia was making progress and there were
18       no signs of infection.  Although I anticipated that inmate Garcia
        would never regain full range of motion, and he had multiple
19       problems with all his fingers based on his chronic conditions, he
        was able to engage in physical activity such as basketball.

20

21       29.  On December 4, 2008, Dr. Lovett conducted his final follow-up examination

22  of plaintiff, and dictated the following report (Dfts. Exh. Y):

23       Mr. Garcia is well known to me having suffered a PIP dislocation
        of his severely arthritic right ring finger a little over a year ago.  He
24       underwent a volar reconstruction and developed a pin track
        infection.  He has gone on to heal his wound, but has minimal
25       range of motion of his right ring finger through the PIP joint.  Once
        again x-rays note severe end stage osteoarthritis with a gross
26       deformity of his long finger with severe involvement of his right

1

finger PIP joint.  He understands this is all chronic disease, ongoing for a number of years.  I did discuss an option with his being referred to U.[C.] Davis; however, they would only offer him a fusion and not an arthroplasy.  He is no interest in a fusion and thereafter I have nothing further to offer to him either.  He has been discharged from orthopedics.

2

3

4

5

As recounted in 2012, Dr. Lovett described the same examination as follows

6

(Lovett Decl. at ¶ 21):

7

On December 4, 2008, I conducted my final follow-up examination of inmate Garcia.  I found that inmate Garcia's right fourth finger had healed.  I also noted that inmate Garcia has chronic osteoarthritis in his other fingers; however, Garcia's chronic condition is unrelated to his basketball injury from September 2007. I discussed with inmate Garcia the option of being referred to U.C. Davis.  Because U.C. Davis would only offer him a fusion, inmate Garcia stated that he was not interested in such treatment.  Therefore, I could no longer offer any more options for inmate Garcia, and discharged him from orthopedics.

8

9

10

11

12

13

30.  In his First Amended Complaint signed February 3, 2011, plaintiff avers that

14

he has "permanently lost mobility to my finger.  It also will not stop hurting."  (FAC at ¶ 25.)

15

IV.  Discussion

16

All defendants contend that they were not deliberately indifferent to plaintiff's

17

serious medical needs and, thus, that no defendant violated plaintiff's Eighth Amendment rights.

18

Each defendant also contends, alternatively, that he or she is entitled to qualified immunity.

19

As a threshold matter, and viewing the evidence in the light most favorable to

20

plaintiff, the court finds that, with the benefit of hindsight, plaintiff's finger injury sustained on

21

September 2, 2007, and associated pain, were "serious medical conditions" within the meaning

22

of the Eighth Amendment.  A medical need is serious "if the failure to treat a prisoner's

23

condition could result in further significant injury or the 'unnecessary and wanton infliction of

24

pain.'"  McGuckin, 974 F.2d at 1059 (quoting Estelle, 429 U.S. at 104).  A serious medical need

25

includes an injury that a reasonable doctor or patient would find important and worthy of

26

comment or treatment, a medical condition that significantly affects an individual's daily

17

1    activities, or chronic and substantial pain.  Wood v. Housewright, 900 F. 2d 1332, 1337-41 (9th

2    Cir. 1990) (citing cases).  By establishing the existence of a serious medical need, a prisoner

3    satisfies the objective component for proving an Eighth Amendment violation.  Farmer v.

4    Brennan, 511 U.S. 825, 834 (1994).

5           The court next turns to the subjective component of plaintiff's Eighth Amendment

6    claims -- each defendant's state of mind in responding, or allegedly failing to respond, to

7    plaintiff's serious medical needs.

8                        A.  Defendant A. Palomino, Registered Nurse

9           Plaintiff claims that defendant A. Palomino, R.N., was deliberately indifferent to

10   his serious medical needs when Palomino delayed, until September 6, 2007, treating plaintiff's

11   finger injury that occurred on September 2, 2007.  Defendant Palomino contends that the

12   evidence demonstrates she was unaware of plaintiff's injury until September 5, 2007, when she

13   scheduled plaintiff for an appointment and examination the following day.  Defendant Palomino

14   also contends that plaintiff has presented no evidence demonstrating that Palomino's alleged

15   delay in providing treatment caused plaintiff substantial harm.

16          Plaintiff alleges that he showed Palomino his broken finger on September 2, 2007,

17   told her he was in significant pain, and requested emergency treatment; but that Palomino

18   ordered plaintiff to leave and motioned for the security guard.  Plaintiff alleges that he again

19   showed Palomino his finger, complained of pain, and requested emergency treatment, on

20   September 4, 2007; but that Palomino refused, and directed plaintiff to place his request for

21   health services in the clinic box.  Plaintiff alleges that, on September 5, 2007, he again returned

22   to the clinic, hoping that another nurse would be on duty; however, when he again requested

23   treatment from Palomino, she summoned the guard and asked him to escort plaintiff, who "told

24   her I would leave on my own and left.  I returned to my cell and lay down, racked with pain."

25   (Pltf. Decl. at ¶ 6.)  Plaintiff states that, on the evening of September 5, 2007, he received a ducat

26   to report to the clinic the next day.  Plaintiff alleges that, on September 6, 2007, when Palomino

                                              18

1    finally examined his finger, she submitted only a "routine" request for x-rays and told plaintiff

2    that they would be taken, "When they get around to it." (FAC at 4.)  When plaintiff requested

3    that the x-rays be taken sooner, Palomino allegedly told plaintiff to leave the clinic.

4            Defendant Palomino responds that she has "no recollection" of seeing plaintiff on

5    September 2, 2007. (Palomino Decl. at ¶ 3.)  Palomino makes no averments regarding

6    September 4, 2007.  Rather, Palomino avers that "[t]he first date that I recall seeing inmate

7    Garcia regarding his finger was on September 5, 2007." (Id. at ¶ 4.)  She states that, "[a]s the

8    triage nurse on that day, . . . I did not observe any bleeding, protruding bones, or significant

9    swelling.  Therefore, I did not believe that Garcia had a medical emergency, and I scheduled

10   Garcia for an appointment for the next morning based on CDCR protocol." (Id.)  Palomino

11   states that on the next day, September 6, 2007, she "examined the fourth digit of [plaintiff's]

12   right hand," and noted "[t]here was moderate swelling, but the alignment of the finger was

13   good." (Id. at ¶ 5.)  Palomino states that, within five minutes of examining plaintiff's finger, she

14   notified the physician on duty, Dr. Hashimoto, who ordered x-rays and prescribed Motrin.

15   Regarding her subjective state of mind during this period, plaintiff avers (id. at ¶¶ 6-8):

16           As a Registered Nurse, I am responsible for referring inmates to a
             physician if further examination and/or treatment is medically
17           indicated.  I have no authority to order x-rays without the
             permission of a physician.  Moreover, I have no control over when
18           x-rays are scheduled.

19           I never delayed treatment for inmate Garcia.  Upon receiving
             inmate Garcia's Health Care Services Request Form, I scheduled
20           an appointment for inmate Garcia the next day.  I promptly notified
             Dr. Hashimoto about inmate Garcia's condition after I examined
21           his finger.

22           I have never intended that inmate Garcia suffer any undue or
             unnecessary pain with respect to his medical conditions, or for any
23           other reason.  My intentions throughout were to ensure that Garcia
             promptly received treatment that was medically necessary and
24           appropriate for his conditions.

25           Intentionally denying or delaying access to medical care may manifest deliberate

26   indifference to a prisoner's serious medical needs, and hence the unnecessary and wanton

                                                19

1    infliction of pain proscribed by the Eighth Amendment.  Estelle, 429 U.S. at 104-05 (citations

2    and quotation marks omitted).  "[A]ny delay in treatment that was potentially motivated by

3    animus creates a material issue of fact for the jury."  Snow v. McDaniel, 681 F.3d 978, 990 (9th

4    Cir. 2012).  However, to prevail on a claim of deliberate indifference arising from a delay in

5    medical care, the plaintiff must show that the delay was harmful.  See Berry v. Bunnell, 39 F.3d

6    1056, 1057 (9th Cir. 1994); McGuckin, 974 F.2d at 1059; Wood v. Housewright, 900 F.2d 1332,

7    1335 (9th Cir. 1990); Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir. 1989); Shapley v.

8    Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985) (citing Estelle, 429 U.S.

9    at 106) ("mere delay of surgery, without more, is insufficient to state a claim of deliberate

10   medical indifference . . .  unless the denial was harmful").  "A prisoner need not show his harm

11   was substantial; however, such would provide additional support for the inmate's claim that the

12   defendant was deliberately indifferent to his needs.  If the harm is an isolated exception to the

13   defendant's overall treatment of the prisoner it ordinarily militates against a finding of deliberate

14   indifference."  Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing McGuckin, 974 F.2d at

15   1060 (internal citations omitted).

16           The record lacks any evidence indicating that the delay in plaintiff obtaining

17   initial medical care, from September 2, 2007 to September 6, 2007, complicated plaintiff's injury

18   by rendering it less responsive to surgery or receptive to healing.  Plaintiff conceded this lack of

19   evidence when he testified as follows at his deposition (Pltf. Depo. at 50:1-8):

20           Q:  [D]o you know whether the delay in [defendant Palomino]
             seeing you caused further injury to your finger?
21
             A:  I don't know.  I think that would be for a jury to decide.
22
             Q:  Do you have any doctors who said that the delay in seeing you
23           caused further injury to your finger?

24           A:  No, I don't.

25   Defendants' medical expert, Dr. S. Heatley, reviewed plaintiff's medical records and opined that

26   "there is no indication that any alleged delay caused by Nurse Palomino worsened Garcia's

                                                     20

1  condition." (Heatley Decl. at ¶ 4 (Dfts. Exh. BB).)  There is no record evidence contradicting

2  this assessment.

3          On the other hand, it is undisputed that, during this period, plaintiff's finger injury

4  caused him significant pain, which in itself can support a finding of harm sufficient to sustain an

5  Eighth Amendment claim.  Moreover, plaintiff alleges that he repeatedly told defendant

6  Palomino that he was experiencing significant pain.  Construing these allegations in the light

7  most favorable to plaintiff, the court must assume that defendant Palomino was aware of

8  plaintiff's complaints of pain from September 2, 2007 until September 6, 2007.  However, even

9  making this assumption, the court finds no evidence to support a reasonable inference that

10  Palomino knew of, and disregarded, a substantial risk of harm to plaintiff.  Plaintiff's finger was

11  not visibly broken, distorted or discolored.  As earlier noted, on September 5, 2007, defendant

12  Palomino, as triage nurse concluded that plaintiff did have a medical emergency because she "did

13  not observe any bleeding, protruding bones, or significant swelling" of plaintiff's finger.

14  (Palomina Decl. ¶ 4.)  Similarly, defendant Palomino's own treatment notes describe plaintiff's

15  broken finger, on September 6, 2007, as having normal color without bruising, good alignment,

16  and only moderate swelling.  (Dfts. Exh. E.)  As defendants' medical expert, Dr. Heatley, opines,

17  "[t]here is no indication in the medical records that Garcia had a medical emergency, as there

18  was no bleeding, protruding bones, or significant swelling around the finger Garcia said he

19  injured." (Heatley Decl. at ¶ 4.)  Thus, the appearance of plaintiff's finger on September 5 and 6,

20  2007 (and its likely similar appearance commencing September 2, 2007), supports an inference

21  that Palomino reasonably concluded that plaintiff's pain allegations were exaggerated, and there

22  was no reason to depart from clinic protocol.  As defendants' expert opines, "[a]ccording to the

23  protocol in the medical clinic, it [was] proper for Nurse Palomino [on September 5, 2007] to

24  request that Garcia fill out an Health Care Services Request Form and schedule Garcia for an

25  appointment, where she could more thoroughly examine Garcia and refer him to a doctor, if

26  ////

1  necessary."[1]  (Heatley Decl. at ¶ 4.)

2          A defendant may avoid liability under a deliberate indifference theory if she

3  believed that the risk of temporary inaction was insubstantial, and thus responded reasonably in

4  light of all the circumstances.  Farmer, 511 U.S. at 844-45.  Because the record evidence

5  demonstrates that plaintiff's injury was not obvious, even upon clinical examination, it is

6  reasonable to infer that defendant Palomino responded reasonably in light of all the

7  circumstances.  There is no evidence to support a finding that defendant Palomino, at any time

8  through September 6, 2006, purposefully refrained from treating plaintiff despite knowing of,

9  and disregarding, a substantial risk of harm to him.  Plaintiff has alleged no basis on which to

10  infer that defendant Palomino held personal animosity against plaintiff, e.g. plaintiff does not

11  allege that the two had any previous negative interactions.  Moreover, it appears that plaintiff's

12  pain symptoms quickly subsided once he received pain medication.  Only five days after Dr.

13  Hashimoto prescribed motrin to plaintiff, on September 6, 2007, Dr. Galloway noted that

14  plaintiff's pain was "modest," and that plaintiff had "variously splinted (buddy & popsicle) [his

15  injured finger] and continued to play basketball."  (Dfts. Exh. F.)

16  ////

17

18          [1] Counsel for defendant Palomino described Palomino's adherence to clinic protocol as
    follows (ECF No. 28 at 23-4):

19

20          [E]ven assuming arguendo Garcia's allegations that Nurse
            Palomino told Garcia to fill out a health care request form on
21          September 2 (sic), 2007, any reasonable nurse in Nurse Palomino's
            situation would believe that she was lawfully entitled to tell Garcia
            to fill out a health care request form and schedule him for an
22          appointment because she was following the CDCR health care
            protocol in nonemergency situations.  Garcia admits that his finger
23          was not swelling or bleeding, and there were no protruding bones.
            Because there were no signs of an emergency when he saw Nurse
24          Palomino, it was be reasonable for Nurse Palomino to schedule
            Garcia for an appointment to have his finger examined.  Nurse
25          Palomino also reasonably believed that by referring Garcia to Dr.
            Hashimoto, who ordered x-rays, she had performed her duties as a
26          registered nurse.

1    For these several reasons, the undersigned finds that plaintiff is unable to sustain

2  his claim that defendant Palomino was deliberately indifferent to plaintiff's serious medical

3  needs.

4    The court need not reach defendant's alternative contention that she is entitled to

5  qualified immunity.  Where the alleged facts, viewed in the light most favorable to plaintiff, do

6  not sustain a constitutional claim, the court need not further consider a defendant's qualified

7  immunity defense.  Saucier v. Katz, 533 U.S. 194, 201 (2001).

8    Accordingly, the undersigned recommends that summary judgment be granted for

9  defendant Palomino.

10    B.  Defendant Akintola

11    Plaintiff claims that defendant O. Akintola, a Physician's Assistant, was

12  deliberately indifferent to plaintiff's serious medical needs when, on October 1, 2007, Akintola

13  allegedly failed to treat signs of an infection in plaintiff's finger and, on October 11, 2007,

14  allegedly prescribed the "wrong" antibiotic.  Defendant Akintola moves for summary judgment

15  on the ground that the clear weight of the evidence shows he did not ignore signs of infection,

16  and prescribed a medically reasonable antibiotic.

17    Plaintiff alleges that, on October 1, 2007, Akintola failed to treat a foul odor and

18  puss allegedly emanating from the surgical site on plaintiff's finger.  (FAC at ¶ 14; see also ECF

19  No. 30 at 9 ("October 1, 2007, plaintiff heard Akintola say Plaintiff's finger may be infected

20  because it smelled foul").)  However, the evidence of record demonstrates that there was no

21  obvious sign of infection at the surgical site on October 1, 2007.  Rather, the available treatment

22  and progress notes indicate that, following plaintiff's surgery on September 17, 2007, until

23  October 11, 2007, there was no sign of infection.  (ECF No. 28-2 at 56, 58,60 (Dft. Exh. J, K,

24  L).)  The most closely-related treatment note was entered on October 3, 2007, and states "∅ foul

25  odor or drainage noted." (ECF No. 28-2 at 56.)  (See n.1, supra.)  The first record evidence of a

26  post-operative infection was on October 11, 2007.  (Id. at 64-5 (Dfts. Exh. N).)

1    Plaintiff alleges that defendant Akintola's treatment notes for October 1, 2007,

2  were "altered," specifically that defendants' Exhibit K "purports to show a handwritten report"

3  that omits reference to the signs of infection noted on the "actual CDC Form 7230," set forth as

4  plaintiff's Exhibit 6.  (ECF No. 30 at 9).  The court's review of these exhibits demonstrates that

5  plaintiff's argument is without merit.  Both exhibits are dated October 1, 2007, and both are

6  written and signed by defendant Akintola.  Plaintiff's Exhibit 6 (Form CDC 7230

7  ("Interdisciplinary Progress Notes")) reflects defendant Akintola's examination of plaintiff's

8  finger and his notes, in pertinent part, that there was "∅ swelling, signs of infection, discharge."

9  (ECF No. 30 at 30.)  Defendants' Exhibit K (Form CDC 7221 ("Physician's Orders")) calls for

10  "dressing changes" and "suture removal."  (ECF No. 28-2 at 58.)  Plaintiff argues that the alleged

11  alteration of Exhibit K is demonstrated not only by the omitted references to "swelling, signs of

12  infection, discharge," but by the time designations on the exhibits, specifically, that Exhibit 6

13  reflects that defendant Akintola commenced his examination at 11:13 a.m., while the time

14  designated on Exhibit K is 11:00 a.m.

15    Because it is apparent that plaintiff has missed or misconstrued the symbol "∅,"

16  which designates an absence of the noted factor, viz., "*no* swelling, signs of infection, discharge,"

17  the court finds the minor time variations in the subject exhibits immaterial.  Simply put, there is

18  no record evidence of an infection at plaintiff's surgical site on October 1, 2007.  Therefore,

19  summary judgment for defendant Akintola is warranted on plaintiff's Eighth Amendment claim

20  premised on Akintola's treatment rendered October 1, 2007.

21    Similarly, there is no evidentiary support for plaintiff's claim that Akintola

22  prescribed the "wrong" antibiotic to plaintiff when, on October 11, 2007, he prescribed

23  Ciprofloxacin.  On that date, plaintiff reported to the medical clinic with complaints of pain, and

24  his surgical dressing saturated with blood; plaintiff stated that he had slept on his hand.  The first

25  attending nurse indicated that plaintiff's finger was "swollen, reddened & opened; draining

26  wound with surgical pen (sic) inserted - difficulty with ROM [range of motion][ -- c/o

1  [complains of] severe pain -- needs M.D. evaluation today, supposed to see Dr. Lovett (ortho)

2  today . . . Dr. Lovett unable to see pt today . . ." (ECF No. 30 at 33 (Pltf. Exh. 9).)  Thereafter, on

3  the same date, PA Akintola examined plaintiff's finger, and immediately prescribed

4  Ciprofloxacin, 500 mg twice a day for 14 days, Motrin for a period of 30 days, and twice-daily

5  changes of surgical site dressing for 5 days.  (Id.; see also ECF No. 28-2 at 64-5 (Dfts. Exh. N).)

6  The prescriptions were approved by the supervising physician, Dr. Hashimoto.  (Id. at 65.)

7       Pursuant to the instant motion, defendant Akintola avers that "Ciprofloxacin is

8  used to treat or prevent certain infections caused by bacteria, and frequently used for skin and

9  skin structure infections," and emphasizes that the medication was approved for this purpose, for

10 plaintiff, by Dr. Hashimoto, the supervising physician.  (Akintola Decl. at ¶ 5.)  Defendants'

11 expert, Dr. Heatley, echoes these observations (Heatley Decl. at ¶ 5), and opines that "there are

12 no signs in Garcia's medical records that he had an adverse reaction to the Ciprofloxacin or the

13 ibuprofen, or [that] the medications worsened Garcia's condition" (id.).  In fact, after plaintiff

14 commenced taking Ciprofloxacin, the infection at his surgical site initially decreased.  (See

15 treatment records for October 14 and 15, 2007 (ECF No. 28-2 at 62).)  It was not until October

16 19, 2007, that there appeared some edema and a "small amount [of] white discharge from

17 [plaintiff's] lower bottom finger." (Id.)  The next entries are not until October 30, 2007, when

18 plaintiff removed the surgical pin, and his finger was swollen and lacked range of motion.  (Id. at

19 73 (Dfts. Exh. R)).  A culture taken on that day tested positive for "staph aureras" (also, "staph

20 aureus").  Septra (an antibiotic containing two medications) was prescribed on the same date,

21 October 30, 2007.  (Id. at 77 (Dfts. Exh. T).)  Plaintiff was prescribed yet another antibiotic,

22 Clindamycin, on November 19, 2007.  (Id.)

23       While plaintiff does not explain how the Ciprofloxacin prescribed by defendant

24 Akintola was allegedly "wrong," it is reasonable to infer that plaintiff is alleging that Akintola

25 should have initially prescribed Septra (or Clindamycin), rather than Ciprofloxacin, and was

26 unable to provide "an adequate diagnosis because [plaintiff's] MCSP medical chart was

missing." (Pltf. Decl. at ¶ 17.)  However, there is no record evidence from which to infer that, if

Akintola had access to plaintiff's medical chart, he would have responded differently.  As

defendant Akintola states, "[a]lthough [plaintiff's] chart was not available, I was able to examine

[his] finger and prescribe [him] antibiotics.  Based on my examination, it appeared that inmate

Garcia had developed a post-operative infection on his right fourth finger. . . ." (Akintola Decl.

at ¶ 5.)  Thus, at the first sign of an infection at plaintiff's surgical site, defendant Akintola

prescribed an antibiotic specifically designated for the treatment of skin structure infections, and

also prescribed Motrin to treat plaintiff's pain.

There is no evidence to support a reasonable inference that defendant Akintola

knew of, and disregarded, an excessive risk of harm to plaintiff by prescribing Ciprofloxacin

instead of another antibiotic.  Farmer, 511 U.S. at 837.  The record supports the assessment that

Akintola acted reasonably and with due care.  There was no medical indication that a different

antibiotic might be warranted for plaintiff until October 19, 2007, when plaintiff's finger showed

some edema and discharge; then, not until October 30, 2007, when plaintiff removed the surgical

pin from his finger and he tested positive for a staph infection.  Rather, as opined by defendants'

medical expert, Dr. Heatley, "PA Akintola's prescription was medically reasonable given

Garcia's medical history and the symptoms he was exhibiting on October 11, 2007." (Heatley

Decl. at ¶ 5.)

For these reasons, the court finds no evidence to support plaintiff's claim that

defendant Akintola, at any time, acted with deliberate indifference toward plaintiff's serious

medical needs.  The court need not reach defendant's alternative contention that he is entitled to

qualified immunity.  Where the alleged facts, viewed in the light most favorable to plaintiff, do

not sustain a constitutional claim, the court need not further consider a defendant's qualified

immunity defense.  Saucier, supra, 533 U.S. at 201.

Accordingly, the undersigned recommends that defendants' motion for summary

judgment, as to defendant Akintola, be granted.

26

C.  Defendant Lovett

Plaintiff claims that defendant Dr. Lovett, M.D., an orthopedic surgeon, was deliberately indifferent to plaintiff's serious medical needs when he performed surgery on plaintiff's finger on September 17, 2007, and allegedly failed to provide adequate follow-up care. Plaintiff contends that his finger has "permanently lost mobility," and is in constant pain.  The complaint relies on the findings of radiologist Dr. Pepper, who allegedly found, in reviewing plaintiff's November 21, 2007 x-ray, that "Dr. Lovett had mistakenly left part of a metal pin inside my finger."  (FAC at ¶ 21.)  In opposition to defendants' motion for summary judgment, plaintiff explains that he "believes the excessive swelling and pus may have been caused by part of a screw defendant Lovett left in plaintiff's finger that was discovered when Dr. Pepper examined an x-ray he took November 21, 2007."  (ECF No. 30 at 12.)   Also in opposition, plaintiff alleges that Dr. Lovett failed to order physical therapy or other follow-up care, stating that "[o]n December 21, 2007, defendant Dr. Lovett made a written report, finding, 'I do not feel he needs physical therapy and does not require any further follow up.'"  (Id., citing Pltf. Exh. 15.)

Defendant Dr. Lovett moves for summary judgment on the ground that the record evidence, even when viewed in the light most favorable to plaintiff, demonstrates that Lovett's surgery and treatment of plaintiff's finger met the standard of care, and that plaintiff has presented no expert opinion to the contrary.

As set forth above, Dr. Lovett performed "urgent" surgery on plaintiff's finger on September 17, 2011, in response to the following:  a September 11, 2007 x-ray which showed a "dorsal displacement in the fourth finger" (ECF No. 28-2 at 47 (Dfts. Exh. F)); an "urgent" referral made by MCSP physician Dr. Galloway (ECF No. 30 at 26 (Pltf. Exh. 3); and Dr. Lovett's September 13, 2007 initial, pre-operative, examination.  The surgery consisted of a "volar plate advancement and reconstruction of [plaintiff's] right fourth finger." (Lovett Decl. at ¶ 5; surgical notes at ECF No. 28-2 at 49 (Dfts. Exh. G).)  The surgical notes indicate that "[t]he volar plate was markedly disrupted," and "markedly attenuated," and "[t]here was an old

27

1  osteochondral fragment reflecting possibly an old injury present." (ECF No. 28-2 at 49.)

2  Nevertheless, the surgery presented "no complications." (Lovett Decl. at ¶ 5.)

3            Dr. Lovett conducted a post-surgical follow-up examination on September 27,

4  2007.  Dr. Lovett found that plaintiff's finger appeared normal, and ordered that the sutures be

5  removed in approximately one week, with a re-evaluation in two weeks. (Id. at ¶ 7; ECF No. 28-

6  2 at 54 (Dfts. Exh. I).)  The sutures were removed by a MCSP licensed vocational nurse on

7  October 4, 2008, who indicated that the [surgical] pin in plaintiff's finger was "intact, there were

8  no signs of infection, and the dressing . . . appeared clean, dry and intact." (Id. at ¶ 8; ECF No.

9  28-2 at 60 (Dfts. Exh. L).)

10            Dr. Lovett conducted a second follow-up examination on November 8, 2007.  By

11  that time, plaintiff had removed the surgical pin and been treated with antibiotics.  Dr. Lovett's

12  treatment notes indicate that plaintiff "developed some infection mostly because a pin became

13  loose . . . [plaintiff] actually removed it." (ECF No. 28-2 at 75 (Dfts. Exh. S).)  Dr. Lovett found

14  the site "stable," but opined that it "may take 6 months to a year to resolve and probably will

15  require an arthrodesis of the PIP joint." (Id.)  Dr. Lovett also noted "significant joint disease

16  unrelated to [plaintiff's] finger injury and surgery." (Id.)  In his declaration filed in support of the

17  pending motion, Dr. Lovett explained that plaintiff's finger had residual swelling on November

18  8, 2007, and "it was not likely that the pin had come out on its own, because the pin was properly

19  placed and remained intact for weeks after the surgery." (Lovett Decl. at ¶ 15):

20            Dr. Lovett's subsequent treatment notes, and related portions of his declaration,

21  indicate that he conducted three more follow-up examinations.  On December 20, 2007, Dr.

22  Lovett noted that the operation had been "complicated" by plaintiff's pin track infection, which

23  had resolved, and that the "swelling has nearly completely resolved." (Dfts. Exh. W.)  Dr. Lovett

24  again opined that plaintiff would continue to improve for a period of six months to a year, and

25  instructed him on range of motion exercises. (Id.)  On February 14, 2008, Dr. Lovett found "no

26  signs of infection," but opined that plaintiff would "never regain full range of motion, although

28

1   he is doing much better through the MP joint." (Dfts. Exh. X.)  Dr. Lovett noted that, although

2   plaintiff "has had multiple problems with all of his digits," he was "out shooting hoops." (Id.)

3   On December 4, 2008, pursuant to his final follow-up examination, Dr. Lovett noted that plaintiff

4   had "minimal range of motion" in his "severely arthritic right ring finger." (Dfts. Exh. Y.)  Dr.

5   Lovett noted that plaintiff "understands this is all chronic disease, ongoing for a number of years.

6   I did discuss an option with his being referred to U.[C.] Davis; however, they would only offer

7   him a fusion and not an arthroplasty.  He is not interested in a fusion and thereafter I have

8   nothing further to offer to him either.  He has been discharged from orthopedics." (Id.)

9      Dr. Lovett has submitted the following statement concerning the subject surgery

10   and his follow-up care of plaintiff (ECF No. 28-1 at 40-1 (Lovett Decl. at ¶¶ 22-3)):

11      In my professional medical opinion, inmate Garcia received
   adequate medical care for his finger.  I performed a complex volar
12      plate advancement and reconstruction on inmate Garcia's right
   fourth finger, and regularly followed-up with inmate Garcia.  There
13      were no complications from the surgery for several weeks, as the
   pin placed in inmate Garcia's finger remained intact and there were
14      no signs of infection.  It does not appear that inmate Garcia had
   issues with his recovery until he pulled the pin from his finger
15      himself, and continued to aggravate the wound by squeezing,
   washing, and attempting to drain the swelling himself, in
16      contravention of medical instructions.  Finally, while inmate
   Garcia alleges that I left a metallic fragment in his finger, what
17      Garcia is describing is a metallic suture anchor.  Suture anchors are
   commonly used to secure soft tissue to bone in orthopedic surgery.
18      Garcia's metallic suture anchor was 2 millimeters long, drilled to
   the base of the finger bone, and was an integral part of repairing
19      the torn ligament.  The metallic suture anchor was intended to
   remain attached to the bone, and therefore, there is no reason why
20      it should have been removed from Garcia's finger.

21      I have never intended that inmate Garcia suffer any undue or
   unnecessary pain with respect to his medical conditions, or for any
22      other reason.  My intentions throughout my care and treatment of
   Garcia were to ensure that he promptly received treatment that was
23      medically necessary and appropriate for his conditions.

24      In support of Dr. Lovett's assessment is the opinion of defendants' medical

25   expert, Dr. Heatley, who opines (Heatley Decl. at ¶ 6):

26   ////

Based on Garcia's medical records, Dr. Lovett performed surgery on inmate Garcia's right fourth finger in September 2007 and provided follow-up care for Garcia until December 2008. During this time, Garcia was also regularly seen by several other doctors and medical staff members. There were no complications from the surgery for several weeks, as the pin placed in inmate Garcia's finger remained intact and there were no signs of infection. It does not appear that inmate Garcia had issues with his recovery until he pulled the pin from his finger himself. The metal fragment Garcia claims was left in his finger is a metallic suture, which is intended to stay attached to the bone to repair the ligament. There are no signs that the metallic fragment caused an infection or inhibited Garcia's recovery. Rather, it appears that any infections that arose after Garcia's surgery was caused by Garcia squeezing, washing, and attempting to drain the swelling himself by sticking in a needle at the site of the surgery, in contravention of medical instructions. In my professional medical opinion, inmate Garcia received proper medical care for his finger from Dr. Lovett.

Viewing the record in the light most favorable to plaintiff, the court finds that there is no evidence to support plaintiff's conclusory claims against Dr. Lovett. It is undisputed that, at all relevant times, plaintiff had degenerative arthritis in all of his fingers, which necessarily impacted the potential success of the surgery. As Dr. Galloway observed in reviewing plaintiff's pre-surgical x-rays conducted September 11, 2007, in addition to the problems with plaintiff's fourth finger, the x-rays showed a "bulbous proximal interphalangeal joint in the third finger," and a "hyperextended proximal interphalangeal joint in the fifth finger." (ECF No. 28-2 at 47 (Dfts. Exh. F).) Consistently, the November 21, 2007 post-surgical x-ray showed demineralization of the subject proximal interphalangeal joint (ECF No. 30 at 38 (Pltf. Exh 14)), while the January 30, 2008 MRI of plaintiff's finger showed "advanced osteoarthritic change with eburnation of the joint." (Id. (Exh. 16).)

It is also undisputed that plaintiff engaged in conduct that may have interfered with the natural healing of the surgical site. Plaintiff did not abide by the instructions of his medical providers to keep the site clean and dry, and refrain from applying pressure to it or putting foreign objects in it. Rather, on November 19, 2007, plaintiff conceded that he had, on three occasions, inserted a needle in his finger and squeezed out pus (ECF No. 28-2 at 77 (Dfts.

1  Exh. T); ECF No. 30 at 35 (Pltf. Exh. 11)); on November 27, 2007, he removed his own dressing

2  and squeezed the site (id. at 81); on November 28, and 29, 2007, plaintiff insisted on washing

3  and/or soaking the surgical site (id.).  Moreover, on November 19, 2007, plaintiff conceded that

4  he had stopped, then restarted, taking his prescription for Septra  (ECF No. 28-2 at 77 (Dfts. Exh.

5  T); ECF No. 30 at 35 (Pltf. Exh. 11).) .)

6              Plaintiff contends that he was compelled to disregard the medical advice to refrain

7  from touching his surgical site, for the following reasons (ECF No. 30 at 12-3):

8              On November 27, 2007, plaintiff arrived at the clinic to have his
             dressing changed.  He saw that the nurse changing the dressing was
9            the same nurse who had been changing his dressing for the
             previous week. []  Plaintiff's finger was extremely painful because
10           this nurse kept squeezing his finger too hard on all the previous
             occasions, torturing plaintiff.  So, to avoid further damage and
11           reduce the painful encounter with the nurse, plaintiff squeezed the
             pus out of his finger in front of the nurse and asked her not to
12           resqueeze it.

13           The following day, the same nurse was there.  The nurse would
             also remove plaintiff's bandages that were glued to plaintiff's
14           finger by pus and blood without first washing the pus and blood
             from the bandage.  The nurse was tearing the skin and pin from
15           plaintiff's finger this way.  So, plaintiff insisted that he soak the
             pus and blood from his bandaged finger before removing them and
16           on squeezing the pus from his finger himself rather than the painful
             way the nurse was doing it.

17

18             While plaintiff's significant discomfort is well supported by the record -- e.g. on

19  November 21, 2007, plaintiff's finger was lanced and injected with Lidocaine in an effort to

20  reduce his pain symptoms -- it is more likely than not that plaintiff's actions slowed the healing

21  of his surgical site and finger.  Moreover, notwithstanding plaintiff's assertion to the contrary, the

22  surgical pin was removed by plaintiff on October 30, 2007, prior to the November 27, and 28,

23  2007 appointments recounted above.  In addition, throughout this period, plaintiff continued to

24  play basketball.

25             While neither Dr. Lovett nor Dr. Heatley fully explain the purpose and intended

26  duration of the displaced surgical pin, both doctors address plaintiff's claim that Dr. Lovett

31

1   improperly left a metal screw in plaintiff's finger.  As previously noted, Dr. Lovett states that this

2   "metallic suture anchor was . . . drilled to the base of the finger bone, [] was an integral part of

3   repairing the torn ligament[, and]. . . was intended to remain attached to the bone. . . ." (Lovett

4   Decl. at ¶ 22.)  Dr. Heatley agrees that the "metallic suture . . . is intended to stay attached to the

5   bone to repair the ligament," and opines that "[t]here are no signs that the metallic fragment

6   caused an infection or inhibited Garcia's recovery." (Heatley Decl. at ¶ 6.)  For these reasons

7   identified by Drs. Lovett and Heatley, the court finds no evidence to support plaintiff's claim that

8   Dr. Lovett was deliberately indifferent to plaintiff's serious medical needs by improperly leaving

9   a metal screw in his finger.

10              Finally, plaintiff asserts that Dr. Lovett was deliberately indifferent by allegedly

11  failing to order physical therapy and provide adequate follow-up care.  Dr. Lovett states that he

12  expressly determined, on plaintiff's second follow-up examination on December 20, 2007, that

13  physical therapy was not necessary, because  Dr. Lovett instructed plaintiff on range of motion

14  exercises.  (Dfts. Exh. W.)  Moreover, it appears that plaintiff performed those exercises -- at

15  plaintiff's next follow-up examination, on February 14, 2008, Dr. Lovett noted that plaintiff was

16  "working on getting his flexion down."  There is no evidence of record to support plaintiff's

17  claim that formal physical therapy may have led to a better result than that obtained with the

18  range of motion exercises.  Thus, the court finds no evidence to support plaintiff's claim that Dr.

19  Lovett was deliberately indifferent to plaintiff's serious medical by failing to order physical

20  therapy.  Nor is there any support for plaintiff's claim that Dr. Lovett improperly determined that

21  further follow-up care was unnecessary -- notwithstanding this assessment on December 20,

22  2007, Dr. Lovett had two subsequent follow-up appointments with plaintiff, and terminated his

23  care of plaintiff only after concluding that he had "nothing further to offer him" (Dfts. Exh. Y).

24              For these many reasons, this court finds that the clear weight of the evidence

25  demonstrates that Dr. Lovett was at no time deliberately indifferent to plaintiff's serious medical

26  needs.  The court need not reach defendant's alternative contention that he is entitled to qualified

immunity.  Where the alleged facts, viewed in the light most favorable to plaintiff, do not sustain a constitutional claim, the court need not further consider a defendant's qualified immunity defense.  <u>Saucier</u>, supra, 533 U.S. at 201.

Accordingly, the undersigned recommends that summary judgment be granted for Dr. Lovett.

V.  <u>Conclusion</u>

For the foregoing reasons, IT IS HEREBY RECOMMENDED that:

1.  Defendants' motion for summary judgment (ECF No. 28), be granted;

2.  Judgment be entered in favor of defendants Palomino, Akintola. and Lovett; and

3.  This action be closed.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed and served within 14 days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED:  July 23, 2013

_Kendall J. Newman_
KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

garc2693.msj